**ORAL ARGUMENT NOT YET SCHEDULED**

Case Nos. No. 23-1281

# United States Court of Appeals
# District Of Columbia Circuit

———————————————

VCTU Corp.

*Petitioner*

v.

NATIONAL LABOR RELATIONS BOARD

*Respondent*

———————————————

PETITION FOR REVIEW
OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD
NLRB CASE NO. 27-CA-320744

———————————————

**PETITIONER'S OPENING BRIEF**

———————————————

Andrew S. Goldberg

*Attorney for Petitioner*

## UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| VTCU CORP., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 23-1281 |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## BRIEF IN SUPPORT OF VTCU CORP'S PETITION FOR ADMINISTRATIVE REVIEW

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.    Parties

Petitioner is VTCU Corp., a private corporation. Respondent is the National Labor Relations Board, a federal government agency. There are no intervenors or amici to date.

### II.    Ruling Under Review

Petitioner seeks review, pursuant to Fed. R. App. P. 15, of an Order of the National Labor Relations Board ("NLRB") in the matter of VTCU Corp. and International Union of Operating Engineers, Local 302, Case 27-CA-320744, reported in an Order at 372 NLRB No. 148 dated September 28, 2023.

### III.    Related Cases

Petitioner is not aware of any related case.

## PARTIES RULE 26.1 DISCLOSURE STATEMENT

The Employer is a private corporation. The parent corporation is Virginia Transformer Corp. Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner states that it does not have a parent, subsidiary, or affiliate that has issued shares or debt securities to the public.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

    I.    Parties ....................................................................................... i

    II.   Ruling Under Review ............................................................... i

    III.  Related Cases ........................................................................... i

PARTIES RULE 26.1 DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES .............................................................................v

STATEMENT OF JURISDICTION....................................................................1

STATEMENT OF THE ISSUES........................................................................2

RELEVANT STATUTORY PROVISIONS ......................................................2

STATEMENT OF THE CASE...........................................................................4

    I.    Procedural History...................................................................4

    II.   2022 Representation Election..................................................6

    III.  The Union's Intimidating and Coercive Conduct During The Election Period .......................................................................8

SUMMARY OF ARGUMENT .........................................................................9

STANDARD OF REVIEW FOR ALL ISSUES ...............................................11

STANDING .....................................................................................................13

ARGUMENT ...................................................................................................14

    I.    The Board's Disregard For Proper Procedure During A Mail In Election Warrants a Rerun Election.............................................................14

A.    The Board Failed To Establish A Proper Time Period To Conduct A Mail Ballot Election..........................................................15

B.    The Board Disenfranchised Voters By Setting Too Short A Time Period To Conduct A Mail Ballot Election.........................................19

C.    The Board Failed To Provide Ballots To All Eligible Voters. .21

D.    The Region Counted Void Ballots, Thereby Tainting The Results Of The Election. ..................................................................22

II.    Even If The Region Followed Proper Certification Election Procedure, Which It Did Not, the Union's Intimidating and Coercive Behavior During The Election Warrants A Rerun Election......................................................24

III.    The Region Demonstrated Bias In Its Handling Of The Employer's Post-Election Objections By Denying The Employer's Request For An Extension Of Time To Submit Evidence In Support Of Its Objections, Which Supports A Conclusion That The Board Erred In Denying The Employer's Objections. ...................................................................28

RELIEF SOUGHT ...........................................................................32

CERTIFICATE OF COMPLIANCE.......................................................32

CERTIFICATE OF SERVICE ..............................................................33

## TABLE OF AUTHORITIES

**CASES**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
    522 U.S. 359 (1998) ........................................................14

*B & B Better Baked Foods, Inc.*,
    208 NLRB 493 (1974)......................................................23

*Baja's Place, Inc.*,
    268 NLRB 868 (1984).......................................................31

*Brink's Armored Car*,
    278 NLRB 141, 141 (1986)...............................................18

*Cambridge Tool & Mfg. Co.*,
    316 NLRB 716 (1995).......................................................28

*Cedars-Sinai*,
    342 NLRB 596, 598 (2004)...............................................35

*CenTrio Energy South LLC*,
    2022 NLRB LEXIS 176, Case No. 15-RC-280545 (2022)..................................24

*CitiSteel USA, Inc. v. NLRB*,
    53 F.3d 350, 354 (D.C. Cir. 1995) .....................................14

*Cleveland Constr. Co. v. NLRB*,
    44 F.3d 1010, 1016 (D.C. Cir. 1995) ..................................13

*College Bound Dorchester, Inc.*,
    2021 NLRB LEXIS 251, Case No. 01-RB-261667 (2021)............................ 26, 27

*Consol. Commc'ns, Inc. v. NLRB*,
    837 F.3d 1, 7 (D.C. Cir. 2016)..........................................13

*Corner Furniture Discount Center, Inc.*,
    339 NLRB 1122 (2003)....................................................27

*F.W. Woolworth Co.*,

96 NLRB 380 (1951) ........................................................................................17

*G.H.R. Foundry Division,*
 123 NLRB 1707 (1959) ...........................................................................23

*GADecatur SNF LLC v. NLRB*,
 Nos. 20-1435, 20-1438, U.S. App. LEXIS 35393, at *6 (D.C. Cir., 2021) .........28

*Garda Cl Atlantic,*
 356 N.L.R.B. 594 (2011) ............................................................... 14, 22

*Gilbert v. NLRB,*
 56 F.3d 1438, 1445 (D.C. Cir. 1995*)* .................................................13

*In re General Shoe Corp.,*
 77 NLRB 124, 127 (1948) .......................................................................18

*Int'l Total Servs.*,
 272 NLRB 201 (1984) ...............................................................................19

*Kerona Plastics Extrusion Company,*
 196 NLRB 1120 (1972) ...........................................................................23

*KMS Painting, LLC*,
 371 NLRB No. 69, Case No. 14-RC-281302 (2002) .........................25

*Manorcare of Kingston, PA, LLC v. NLRB*,
 823 F.3d 81 (D.C. Cir. 2016)....................................................... 31, 35

*McLane Mid-Atlantic,*
 316 NLRB 299 (1995) ................................................................. 33, 34

*Mission Indus.*,
 283 NLRB 1027 (1987) .............................................................................18

*NLRB v. Ingredion, Inc*.,
 930 F.3d 509, 514 (D.C. Cir. 2019) ..................................................11

*NLRB v. River City Elevator Co., Inc.*,
 289 F.3d 1029 (7th Cir. 2002) ...............................................................18

vi

*NLRB v. Sw. Reg'l Council of Carpenters*,
  826 F.3d 460, 464 (D.C. Cir. 2016) ....................................................12

*Orr-Sysco Food Services, LLC*,
  338 NLRB 614, 615 (2002) ...............................................................35

*Premier Utility Services*,
  363 NLRB 159 (2016) ........................................................................25

*Professional Transportation Inc.*,
  370 NLRB No. 132, 2021 WL 2658293 (2021) ......................... 29, 30

*Randell Warehouse of Arizona, Inc. v. NLRB*,
  252 F.3d 445, 448 (D.C. Cir. 2001) ...................................................11

*Robert F. Kennedy Medical Center*,
  336 NLRB 765 (2001) ........................................................................22

*S. New England Tel. Co. v. NLRB*,
  793 F.3d 93, 96 (D.C. Cir. 2015) .......................................................13

*Saint-Gobain Industrial Ceramics, Inc. v. NLRB*,
  310 F.3d 778, 781 (D.C. Cir. 2002) ...................................................13

*See Nathan Katz Realty LLC v. NLRB*,
  251 F.3d 981 (D.C. Cir. 2001).............................................................12

*See Yerges Van Liners Inc.*,
  162 NLRB 1259 (1967).......................................................................24

*Shepard Convention Servs., Inc. v. NLRB*,
  85 F.3d 671 (D.C. Cir. 1996)..............................................................19

*Stannah Stairlifts, Inc.,*
  325 NLRB 572 (1998).........................................................................36

*Taylor Wharton Division*,
  336 NLRB 157 (2001).................................................................. 28, 31

*The Nyack Hospital,*
    238 NLRB 257, 259 (1978) .................................................................23

*Thompson Roofing, Inc.*
    291 NLRB 743 (1988) ............................................................. 26, 27

*Titanium Metals Corp. v. NLRB,*
    392 F.3d 439, 446 (D.C. Cir. 2004) ..................................................12

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474, 488 (1951) ..................................................................14

*Vickers, Inc.,*
    152 NLRB 793 (1965) .......................................................................28

*Wolverine Dispatch,*
    321 N.L.R.B. 796 (1996) ..................................................................22

## STATUTES

29 U.S.C. § 160(e) .................................................................................11
29 U.S.C. § 160(f) ......................................................................... 1, 3, 13
29 U.S.C. §157 ........................................................................................2
29 U.S.C. §158(a) .................................................................................2, 5
29 U.S.C. §158(b) ..................................................................................3

## OTHER AUTHORITIES

Election Result Data from the Board's website,
    (https:/nlrb.gov) ................................................................................19

USPS Originating Service Standards website
    (https://postalpro.usps.com/ppro-tools/service-standards-maps) ..........7

*Why Your USPS Mail Package Delivery is About to Get Slower*,
    NPR, April 21, 2022
    (https://www.npr.org/2022/04/21/1094011233/mail-usps-slower-packages) .........18

## RULES

Rules and Regulations of the National Labor Relations Board,
    Section 102.111(b) .............................................................................28

Rules and Regulations of the National Labor Relations Board,
  Section 102.69(a)...............................................................................28

**NLRB PETITIONS**

*DFA Dairy Brands Ice Cream, LLC*,
  Case No. 27-RD-290651 (2022)................................................... 18, 19

*Mountain Capital Partners, LLC*,
  Case No. 27-RC-299644 (2022)................................................... 18, 19

*Pocatello Ready Mix*,
  Case No. 27-RM-303150 (2022).........................................................18

*Universal Protection Service, LP d/b/a Allied Universal Security Services*,
  Case No. 27-RC-305138 (2022).........................................................19

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| VTCU CORP., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )  No. 23-1281 |
| | ) |
| NATIONAL LABOR RELATIONS | ) |
| BOARD, | ) |
| | ) |
| Respondent. | ) |

**THE EMPLOYER'S OPENING BRIEF IN SUPPORT OF ITS PETITION FOR ADMINISTRATIVE REVIEW OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD**

**STATEMENT OF JURISDICTION**

On October 5, 2023, pursuant to Fed. R. App. P. 15, Petitioner VTCU Corp. ("Employer") filed for review of a final Decision and Order of the National Labor Relations Board ("Board") in the matter of VTCU Corp. and International Union of Operating Engineers, Local 302 ("Union"), Case 27-CA-320744, reported at 372 NLRB No. 148 dated September 28, 2023 ("Order"). This Court has jurisdiction in this matter pursuant to Section 10(f) of the Act. 29 U.S.C. § 160(f). There is no deadline by which a Petition for Review of a National Labor Relations Board order need be filed. Thus, this matter has been timely filed.

1

## STATEMENT OF THE ISSUES

I.    Whether the NLRB failed to establish a proper time period to conduct a mail ballot election.

II.   Whether the NLRB disenfranchised voters by setting too short a time period to conduct a mail ballot election, thereby warranting a rerun election.

III.  Whether the NLRB's failure to provide ballots to all eligible voters warrants a rerun election.

IV.   Whether the NLRB counted void ballots, thereby tainting the results of the election.

V.    Whether union misconduct, intimidating and coercive behavior towards voters, during the critical period warrants a rerun election.

VI.   Whether the NLRB demonstrated bias by denying the Employer's request for an extension of time to submit evidence in support of its objections.

VII.  Whether the NLRB erred in denying the Employer's objections to the election.

## RELEVANT STATUTORY PROVISIONS

### Section 7 of the NLRA, 29 U.S.C. §157

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring

membership in a labor organization as a condition of
employment as authorized in section 158(a)(3) of this title.

### Section 8(a) of the NLRA, 29 U.S.C. §158(a)

It shall be an unfair labor practice for an employer – …

(1) to interfere with, restrain, or coerce employees in the exercise
of the rights guaranteed in section 157 of this title…

(5) to refuse to bargain collectively with the representatives of
his employees, subject to the provisions of section 159(a) of this
title.

### Section 8(b) of the NLRA, 29 U.S.C. §158(b)

It shall be an unfair labor practice for a labor organization or its
agents – . . .

(1) to restrain or coerce (A) employees in the exercise of the
rights guaranteed in section 7 [section 157 of this title]: Provided,
that this paragraph shall not impair the right of a labor
organization to prescribe its own rules with respect to the
acquisition or retention of membership therein; or (B) an
employer in the selection of his representatives for the purposes
of collective bargaining or the adjustment of grievances;

### 29 U.S.C. § 160(f)

Any person aggrieved by a final order of the Board granting or
denying in whole or in part the relief sought may obtain a review
of such order in any United States court of appeals in the circuit
wherein the unfair labor practice in question was alleged to have
been engaged in or wherein such person resides or transacts
business, or in the United States Court of Appeals for the District
of Columbia, by filing in such a court a written petition praying
that the order of the Board be modified or set aside . . . Upon the
filing of such petition, the court shall proceed in the same manner
as in the case of an application by the Board under subsection (e)
of this section, and shall have the same jurisdiction to grant to
the Board such temporary relief or restraining order as it deems
just and proper, and in like manner to make and enter a decree

enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## STATEMENT OF THE CASE AND FACTS[1]

### I.    Procedural History

On August 1, 2022, the Union filed a representation petition. From September 7, 2022 through September 28, 2022, the NLRB conducted a mail-in election for employees at the Employer's facility located in Pocatello, Idaho ("the Pocatello, facility"). The election was riddled with logistical challenges; a significant portion of voters did not receive ballots at all and had endless difficulties reaching the NLRB to resolve those matters. In addition to mail related challenges, the Union's Agents intimidated and harassed voters throughout the election and the Board counted void ballots. Accordingly, on October 5, 2022, the Employer filed its objections to the conduct affecting the election. The Employer requested a reasonable extension of time to file its proofs, which was denied by the Regional Director. The Employer supplemented its Objections on October 14, 2022. The Regional Director refused to consider the Employer's supplemental proofs, despite the proofs containing relevant

---

[1] There are no cites to a record because there was no hearing held in this matter. Therefore, the evidence referenced herein is derived from Employer's earlier arguments as presented to the Regional Director and Board (Case No. 27-CA-276823).

information. As part of its plea, the Employer requested a hearing. This request, too, was denied.

On December 22, 2022, the Regional Director for Region 27 of the Board certified the Union as the exclusive bargaining agent for the Employer's maintenance employes.

On January 17, 2023, the Employer sought a Request for Review of the Regional Director's Decision, which was subsequently denied on May 23, 2023.

On or around June 27, 2023, the Union filed an Unfair Labor Practice Charge against the Employer, alleging it violated Section 8(a)(5) and 8(a)(1) of the Act by refusing to meet and bargain collectively with the representative of its employees. The Board found in favor of the Union's argument. On July 26, 2023, the General Counsel for the Board filed a Complaint to uphold its determination of the merits of the Union's Charge and, later, a Motion for Summary Judgment. The Employer timely answered and filed responses to the same and, on September 28, 2023, the Board issued its Order, in which it instructed the Employer to bargain with the Union. The Board's Order is not supported by substantial evidence and departs from established precedent without reasoned justification. Accordingly, it must be denied in its entirety.

Since the Order, the Employer has refused to bargain with the Union.  It is the position of the Employer that Region 27 of the Board and the Union engaged in

5

conduct which would require, at the very least, a hearing over the objections filed by the Employer, or a finding requiring the Board to rerun the election held on September 28, 2022. Based on Region 27's conduct, and the Union's conduct during the pendency of the petition it filed, the Employer is seeking judicial review of the Regional Director's Certification of the Results of the Election and a ruling that it be overturned and the Union's s Unfair Labor Charges against the Employer, alleging it violated Section 8(a)(5) and 8(a)(1) of the Act by refusing to meet and bargain collectively with the representative of its employees, be dismissed.

## II.     2022 Representation Election

A representation election was held via mail to determine whether certain employees at the Pocatello facility wished to be represented by the Union for the purposes of collective bargaining. The election period ran from 3:00 p.m. (MT) on September 7, 2022, when Region 27 was supposed to have mailed the ballots, through September 28, 2022. In order to be counted, mail-in ballots were to be received by the Regional Office in Denver, Colorado, no later than 3:00 p.m. (MT). September 28, 2022.

The Employer in this case agreed to a mail-in election based upon the Region's position that a three-week window period was sufficient for voters to receive and send back their ballots. The Region should have known the period was insufficient. The Employer trusted that Region 27 would timely mail out ballots and

that there would be enough time for voters to receive the ballots, contact the Regional office should they not receive a ballot, ultimately receive the ballot after contacting the Region and then return it in time to be counted. The voting period was insufficient to allow all eligible voters to exercise their rights to vote to determine if they wished to be represented for collective bargaining purposes by the Union.

To wit: Only one hundred and sixteen votes were cast out of the one hundred and eighty-two employees who were eligible to vote. Of the votes case, there were sixty-six "Yes" votes, forty-five "No" votes, seven void ballots, and five challenged ballots. Only one hundred eleven votes cast in this election were eligible ballots. The margin of outcome in the election was twenty-one votes. Thus, eleven votes are determinative. The Employer's objections involved a determinative number of eligible voters because, as mentioned, seventeen eligible voters did not timely receive a ballot, two never received a call back from the Regional Office when they reached out to request a ballot (one person eventually was given a ballot after he called a second time), one employee received a ballot on October 10, 2022 (weeks after the voting period closed), four did not have their ballots counted (presumably the Region had not received these ballots by 3:00 p.m. (MT) on September 28, 2022 when the count was conducted), five had their ballots challenged, six ballots should not have been counted as a matter of law, and three voters were intimidated and threatened by the Union about their vote. This is a total of 31 voters.

At the time the election was held, the Pocatello area had been plagued by mail delivery delays since the United States Postal Service stopped processing mail in the Pocatello Area in 2015 and moved the processing to Salt Lake City. These delays are well documented throughout social media, as well as local news outlets and local newspapers that Pocatello has continued to suffer these delays. The originating service time for the delivery of mail from Denver to Pocatello according to the USPS Originating Service Standards website (https://postalpro.usps.com/ppro-tools/service-standards-maps) is five days. Furthermore, while lost mail can be an issue, (according to the USPS, it loses up to 3% of all mail delivered), based on those interviewed, at least seventeen out of one hundred eighty-two employees did not receive a ballot. This is a percentage rate of 9.3% of the ballots mailed.

### III.    The Union's Intimidating and Coercive Conduct During The Election Period

At least three employees felt intimidated and harassed during the critical period from the time the ballots were mailed until the time the ballots were counted. These employees would testify that Union Agents came to the home of Dillon McLaughlin repeatedly, even though he asked them to leave and told the Union Agents they were trespassing. While McLaughlin was away on a hunting trip, the Union Agents came to his house when only his wife was home and asked to see McLaughlin. His wife informed them that he was not home, but they remained at the house insisting that he was home and demanded to speak to him. She felt so

8

threatened that she came out of the house and the Union Agents followed her around her yard as she requested assistance from a neighbor who informed the Union Agents that if they did not leave, he would call the police. McLaughlin also received a text in response to discussions he had as to why he would not vote for the Union that, "That's because you are a suck dick roll over take it in the ass dick sucking faggot." He described one of the Union Agents as a Caucasian man with a beard.

The Union videotaped another employee, Anna Ortiz, at her home despite her repeated pleas that they stop filming her. She identified the Union Agent as "Lallo" who was Hispanic and another person who was Caucasian with a beard who she did not know. Additionally, Miriam Carrillo received text messages from Union Agents offering to help her cast her ballot.

## SUMMARY OF ARGUMENT

This is a test-of-certification case arising from a razor-thin, and wholly improper representation election. More specifically, this is a petition to review an order of the NLRB issued on September 28, 2023, based on the Employer's technical refusal to bargain, in order to challenge a Board certification of a union as the bargaining representative of the Employer's employees. The Employer does not deny that it has refused to bargain with the Union, but instead maintains that the election process, including the manner in which the NLRB conducted the election and the

manner in which the Union conducted itself during the pendency of its petition, required the NLRB to conduct a rerun election.

To start, the impropriety of the election itself warrants a rerun election. The current certification is based on an election that failed to establish a sufficient voting period when it provided a mere three (3) weeks to a conduct a mail in ballot election in a locale notoriously plagued by mail-related issues. The NLRB's shortsightedness and departure from Board precedent in establishing a sufficient timeframe resulted in a significant portion of voters who either received ballots late, and with insufficient time to mail in a vote by the September 28, 2022 deadline, or worse, who did not receive ballots at all. Voters were left with virtually no recourse, as channels for communication with, and supports offered by, the NLRB were limited. The short election window, a departure from Board precedent, constituted an election irregularity. This irregularity resulted in significant voter disenfranchisement, which was further compounded by the NLRB's counting of void ballots. The number of votes impacted by these logistical challenges and departures from precedent were outcome determinative.

Even if the voting period did appropriately account for geographic challenges, the Union's conduct during the election was so grossly violative of the Act that, at a minimum, the Board should have held a hearing on the Employer's

objections. Specifically, throughout the election, the Union coerced and acted inappropriately towards at least three (3) voters.

Finally, despite the Employer's timely objections to the election, the Board erroneously refused to investigate the Employer's claims, even going so far as to baselessly reject the Employer's supplemental offer of proof in support of its objections. Not only did the Board's handling of the Employer's objections run contrary to Board precedent, but the Board's premature certification is demonstrative of the Board's anti-Employer bias.

### STANDARD OF REVIEW FOR ALL ISSUES

Union election proceedings and unfair labor charges are not directly reviewable by the courts. Therefore, an employer seeking review of the Board's certification must first refuse to bargain with the union. The factual findings of an administrative agency such as the Board are typically reviewed under the substantial evidence standard. The Court will uphold the Board's factual findings as "conclusive 'if supported by substantial evidence on the record as a whole.'" *NLRB v. Ingredion, Inc.*, 930 F.3d 509, 514 (D.C. Cir. 2019) (quoting 29 U.S.C. § 160(e)).

While the Board may be vested with "a 'wide degree of discretion'," in representation cases, Randell Warehouse of Arizona, Inc. v. NLRB, 252 F.3d 445, 448 (D.C. Cir. 2001) (internal citations omitted), it nevertheless must "act in a reasoned fashion, not arbitrarily and capriciously."  See *Nathan Katz Realty LLC v.*

*NLRB*, 251 F.3d 981, 994 (D.C. Cir. 2001) (internal citations omitted). A Board order "will be [] set aside when it departs from established precedent without reasoned justification, or when the Board's factual determinations are not supported by substantial evidence." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004) (internal citations omitted).

"A decision of the Board that departs from established precedent without a reasoned explanation is arbitrary." *NLRB v. Sw. Reg'l Council of Carpenters*, 826 F.3d 460, 464 (D.C. Cir. 2016) (internal quotations and citation omitted). Significantly, "the Board cannot ignore its own relevant precedent but must explain why it is not controlling." *Id.*, quoting *BB&L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995) (internal citations omitted). "[This Court has] repeatedly told the Board that 'silent departure from precedent' will not survive judicial scrutiny." *Cleveland Constr. Co. v. NLRB*, 44 F.3d 1010, 1016 (D.C. Cir. 1995). Accord: *Gilbert v. NLRB*, 56 F.3d 1438, 1445 (D.C. Cir. 1995) ("It is . . . elementary that an agency must conform to its prior decisions or explain the reason for its departure from such precedent."), cert. denied, 516 U.S. 1171 (1996).

On appeal, the Court reviews the Board's application of the law to the facts for reasonableness, taking into account the record as a whole. *S. New England Tel. Co. v. NLRB*, 793 F.3d 93, 96 (D.C. Cir. 2015); *Saint-Gobain Industrial Ceramics, Inc. v. NLRB*, 310 F.3d 778, 781 (D.C. Cir. 2002). To this end, the Court "will not

rubber-stamp [Board] decisions, and [it will] examine carefully both the Board's findings and its reasoning." *Consol. Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 7 (D.C. Cir. 2016) (internal quotations and citations omitted).

The Court is not free to ignore evidence or draw only those inferences that favor one party. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 at 378–79 (1998). This includes not only materials that support the Board's findings but also "whatever in the record fairly detracts from its weight." *CitiSteel USA, Inc. v. NLRB*, 53 F.3d 350, 354 (D.C. Cir. 1995) (citations omitted); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951).

In this case, the Board's Order cannot be affirmed, as its certification of the unit cannot survive judicial scrutiny. In failing to decide central issues - whether possible election impropriety or disenfranchisement through election timelines or Union misconduct occurred - the Board ignored its own relevant precedent and did not explain why. The Board's Order also cannot be affirmed because the Board acted arbitrarily in rushing to declare the election result final, thereby sacrificing employees' rights to have the broadest participation in the election process.

## STANDING

The Employer is an aggrieved party within the meaning of Section 10(f) of the National Labor Relations Act ("Act"). 29 U.S.C. § 160(f). Thus, the Employer has standing to file the Petition for Review.

13

**ARGUMENT**

The Board's Order requiring the Employer to recognize and bargain with the Union should be set aside and its application for enforcement should be denied. Enforcement of the Order would result in the disenfranchisement of an outcome-determinative number of voters and negatively affect the integrity of the election and require the Employer to recognize and bargain with a unit that may not represent a majority of employees who cast valid ballots. Board precedent is clear that where an election irregularity occurs resulting in the possible disenfranchisement of a determinative number of votes, the election should be set aside and a re-run election conducted. *Garda Cl Atlantic,* 356 N.L.R.B. 594 (2011). Even absent ballot receipt and tallying issues, the Order should still be set aside and a rerun election conducted because the Union's conduct throughout the election was improper and coercive. The Order should also be set aside and the Board's application for enforcement denied because the Board improperly certified the election over the Board policy to afford employees the broadest participation in election proceedings.

**I.    The Board's Disregard For Proper Procedure During A Mail In Election Warrants a Rerun Election.**

The Region's mishandling of the election certification is evident in four key respects: first, its failure to establish an appropriate or reasonable time period to conduct the ballot election; second, the blatant disregard for voter disenfranchisement as a result of the abbreviated voting period; third, its failure to

14

provide ballots to all eligible voters; and, fourth, its counting of void ballots, which irreparably tainted the results of the election. On their own, each violation warrants a rerun election. Taken as a whole, credible evidence can support only one conclusion: the Order must be remanded, and the Board ordered to conduct a fair election.

### A. The Board Failed To Establish A Proper Time Period To Conduct A Mail Ballot Election.

In reaching an agreement as to the length of an election period, the Employer, like many employers, relies on the expertise of the Board to appropriately advise. Particularly during the tenure of an administration that is, in theory, pro-employee representation rights, it defies logic and belies the purpose of the Board itself for the Employer to question that the Board's decision in this regard would do anything but foster an efficient and thorough election. Elections are not only a critical aspect of harmonious labor-management relations, but the decision to be represented is an individualized and important decision. To this end, the Employer trusted the Region to conduct an election in a fair and timely manner, to allow all voters to cast their vote on representation without disruption of the postal service or any other entity,

and to maintain open lines of communication throughout the election to address voters' concerns.[2] Clearly, as will be discussed, this was not the case.

The Board does not regard mail ballot elections as the "general course and method by which its functions are channeled and determined," and they are "more vulnerable to the destruction of laboratory conditions than are manual elections." *F.W. Woolworth Co.*, 96 NLRB 380 (1951); In the instant case, the mail-in election most certainly fell victim to the postal service's deficiencies, which would not have been the case in a manual election.

It is a longstanding rule that, generally, representation elections should be conducted manually instead of by mail for manual elections most accurately uphold the "laboratory conditions" of the election. With respect to these "laboratory conditions," the Board has stated that during an election to determine representation, voting is to occur in a "laboratory" in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of Employees. *In re General Shoe Corp.*, 77 NLRB 124, 127 (1948); see also *NLRB v. River City Elevator Co., Inc.*, 289 F.3d 1029 (7th Cir. 2002).

---

[2] Critically, the government is notoriously difficult to reach. With limited hours of availability, and long wait times, individuals who wish to contact government agencies, including the Board, may not always have the ability to wait on hold, or receive a call back. To mitigate potential harms in this respect, the Board should have recommended a longer election period.

Mail-in elections tend to disturb those conditions and also leave the election vulnerable to unrepresentative results. Thus, the onus is on the Regional Office to ensure that the laboratory conditions are maintained as much as possible in a mail-in election, especially when mail-in ballots have become the new normal since the onset of the COVID-19 pandemic in 2020. Further, the lack of direct Board supervision over the mail-ballot voting process increases opportunities for improper coercion and interference. *See, Mission Indus.*, 283 NLRB 1027 (1987) ("[M]ail ballot elections are more vulnerable to the destruction of laboratory conditions than are manual elections, due to the absence of direct Board supervision over the employees' voting." (citing *Brink's Armored Car*, 278 NLRB 141, 141 (1986)).

The Board realizes that mail ballot elections result in less turnout and can destroy the "laboratory conditions" the Board has the responsibility to uphold. To this end, in September 2022, it issued its Decision in *Starbucks Corporation*, 371 NLRB No. 154, Case No. 19-RC-295849 (2022), which set forth the revised Aspirus factors for the Regional Director to consider when exercising discretion in ordering a mail-in election. The Federal Courts have weighed in on this issue as well, taking issue with low voter turnout in mail-ballot elections in overturning election results, *See, e.g., Shepard Convention Servs., Inc. v. NLRB*, 85 F.3d 671, 675 (D.C. Cir. 1996) ("[T]he Board's reversal of the Regional Director's discretionary decision to conduct a manual election cannot be upheld. Had the Board left the decision intact .

. . voter turnout might well have been higher. . . . It could hardly have been lower."); *see id*. at 673 (noting that only 77 out of 438 eligible employees – 17.5 % – cast ballots during two-week mail-ballot election); See also, *Int'l Total Servs.,* 272 NLRB 201 (1984) (setting aside mail-ballot election where only 19% of eligible voters returned their ballots and 23% of eligible voters never received their ballots and urging the Regional Director and the parties "to work together to explore alternative election procedures in order to ensure that all eligible voters have an opportunity to vote and to maximize the probability of a representative vote.").

Despite the fact that the Parties in this case agreed to a mail-in election, the Region only approved a three-week window for voters to receive and send back their ballots, which is insufficient. *See Pocatello Ready Mix*, Case No. 27-RM-303150 (2022) (Region 27 approved a twenty-eight (28) day voting period for a mail-in election in October 2022, and 70% more employees had their votes counted); *DFA Dairy Brands Ice Cream, LLC*, Case No. 27-RD-290651 (2022) (Region 27 allowing for a twenty-nine (29) day voting period in an election); *Mountain Capital Partners, LLC*, Case No. 27-RC-299644 (2022) (Region 27 allowing for twenty-eight (28) day voting period in a mail-in election).

It is no secret that since the onset of the pandemic, mail delivery has suffered significant delays, particularly with First Class Mail, with an average estimated delivery time of five days. See The United States Postal Service Destinating Service

18

Standards (https://postalpro.usps.com/ppro-tools/service-standards-maps). In fact, since the onset of the U.S. Postal Service's new restructuring plan in 2021, "on time" First Class Mail went from an average of 2.7 days from origin to destination, to 4-5 days. *Why Your USPS Mail Package Delivery is About to Get Slower*, NPR, April 21, 2022 (https://www.npr.org/2022/04/21/1094011233/mail-usps-slower-packages). The Pocatello area in this case, as well as other locations in Region 27's jurisdiction, have not been immune to these delays, which undoubtedly affected the election in this case, and should have been considered by the Region. See, *Universal Protection Service, LP d/b/a Allied Universal Security Services,* Case No. 27-RC-305138 (2022) (only 37.5% of eligible voters voted in favor of representation in a mail-in election); *Mountain Capital Partners, LLC*, Case No. 27-RC-299644 (2022) (only 42% of eligible voters had votes counted in a mail-in election); *DFA Dairy Brands Ice Cream, LLC*, Case No. 27-RD-290651 (2022) (only 36% of eligible voters had their votes counted in mail-in election). See Election Result Data from the Board's website, (https:/nlrb.gov).

### B. The Board Disenfranchised Voters By Setting Too Short A Time Period To Conduct A Mail Ballot Election.

The non-receipt of a ballot generally, disenfranchises and disassociates individuals from their free choice of union representation. When evaluating the existence, or severity, of voter disenfranchisement, the Board has repeatedly sought to determine whether an "election irregularity" exists. Board decisions indicate that

an "election irregularity" exists in voter disenfranchisement cases where Board action causes an employee, figuratively speaking, to be locked-out of the voting booth prematurely. Such was the case here, when voters were left effectively in the dark regarding how they receive their ballot or, worse, whether they would receive their ballot. In *Garda Cl Atlantic,* an irregularity was found in the Board agent's closing the polls early. *Garda Cl Atlantic,* 356 N.L.R.B. 594 (2011). In *Wolverine Dispatch,* the Board decided an irregularity existed when the Board agent left the polls with the ballot box for a few minutes during a voting session. *Wolverine Dispatch,* 321 N.L.R.B. 796 (1996). Other reported decisions involve Board Agents arriving late, closing the polls early, and doors to the polling place being locked. See, e.g., *Robert F. Kennedy Medical Center,* 336 NLRB 765 (2001); *The Nyack Hospital,* 238 NLRB 257, 259 (1978); *B & B Better Baked Foods, Inc.*, 208 NLRB 493 (1974); *Kerona Plastics Extrusion Company,* 196 NLRB 1120 (1972)*; G.H.R. Foundry Division,* 123 NLRB 1707 (1959).

Although the aforementioned cases involve manual elections, nothing in the cases suggest the principle does not extend to mail ballot elections. Whether an election is conducted manually or by mail, employees may not be disenfranchised, are entitled to the broadest participation in the election process, and to Union representation that represents the will of a majority of employees who cast valid ballots.

There can be no doubt that the possible disenfranchisement of the seventeen voters whose ballots did not arrive at all, was caused by an election irregularity, specifically, the exceptionally brief voting window for a geographic region otherwise plagued with mail related issues.

### C. The Board Failed To Provide Ballots To All Eligible Voters.

The Board's voting process requires that all eligible voters have access to voting, which in this case, means that all eligible voters must have access to receiving and sending mail-in ballots. See *Yerges Van Liners Inc.*, 162 NLRB 1259 (1967) (the voting procedure requires that all eligible employees be given the opportunity to vote). The Board must conduct the election within legally mandated standards that are universally applied. These legally required standards were not followed in this case.

The Region cannot abdicate its responsibility in conducting a fair election by placing blame on the Parties when the Region did not fully inform the Parties of the mailing issues and postal service delays in the Pocatello, Idaho area, nor did the Region consider the overall delays in mail delivery nationwide. It is the Region's responsibility to ensure that the time it allows for a mail-in election to proceed is adequate for processing, especially in a Region that is affected by frequent postal delays. In fact, this is a concern that has been considered by the Board before, and the instant case is no different. See *CenTrio Energy South LLC*, 2022 NLRB LEXIS

21

176, Case No. 15-RC-280545 (2022); *KMS Painting, LLC,* 371 NLRB No. 69, Case No. 14-RC-281302 (2002); *Premier Utility Services*, 363 NLRB 159 (2016). Here, at least seventeen (17) eligible voters – 9.3% of the total voter pool – did not receive ballots at all due to the postal delays. Overall, only 60.9% of those eligible cast ballots.

The Regional Director's decision certifying the election results should be set aside as the mail-in election results do not accurately reflect the true intent of the voting group. Certification will and should result when the union receives a majority, i.e., more than 50%, of the votes cast. In the instant case however, only 60.9% of the eligible voters voted in the election. And while a majority of those who cast a ballot voted "Yes" (in favor of Union representation), only 36% of the eligible voters decided for the entire voting group in favor of having a union represent the bargaining unit. This is by no means representative of the majority's wishes. Choosing to certify election results with only 36% of votes in favor of the Union, which, unfortunately, is not an anomaly as seen in recent Board decisions and is more than sufficient grounds for the Order to be set aside.

### D. The Region Counted Void Ballots, Thereby Tainting The Results Of The Election.

The Board Agent in charge of ensuring that only legally valid ballots be counted, accepted and counted ballots that were void as a matter of law since the employees printed their names on the envelope. The Board held in *Thompson*

*Roofing, Inc.* 291 NLRB 743 (1988) that ballots on which the envelope has a printed name rather than a signature are void. Moreover, Section 11336.5(c) of the National Labor Relations Board Case Handling Manual (Part 2) Representation Procedures states that "Ballots that are returned in envelopes with no signatures or with names printed rather than signed should be voided." National Labor Relations Board Case Handling Manual, Section 11336.5(c). The Region may argue that the Parties agreed to count these ballots. Such argument fails because that decision was not for the Union or the Employer to decide. These ballots are void as opposed to voidable as a matter of law and should not have been counted at all.

In *College Bound Dorchester, Inc.*, the Board granted the employer's request for review where it alleged that a voter's signature on his mail-in ballot was illegible and, thus, should have been voided as it could not be certain the ballot came from an eligible voter. Determining that it was improper for the Regional Director to overrule the employer's objection on this issue, the Board followed its well-established precedent set forth in *Thompson Roofing, Inc.*, 291 NLRB 743 (1988), which stands for the fact that an improper signature on a ballot necessarily ***voids*** the ballot, thus precluding it from the eligible count (emphasis added). *College Bound Dorchester, Inc.*, 2021 NLRB LEXIS 251, Case No. 01-RB-261667 (2021). The Regional Director in the instant case, therefore, departed from clearly established precedent in

23

counting void ballots, which not only altered the voting result overall, but the determinative outcome of the election.

## II. Even If The Region Followed Proper Certification Election Procedure, Which It Did Not, the Union's Intimidating and Coercive Behavior During The Election Warrants A Rerun Election.

In addition, and as a separate and distinct basis, the election should be set aside and rerun because the Union engaged in coercive and threatening conduct towards voters during the election period. It is a longstanding Board rule that it will set aside an election if a party to the election commits objectionable conduct that may have affected the outcome of the election, including conduct perpetrated by union representatives. See, e.g., *Corner Furniture Discount Center, Inc.*, 339 NLRB 1122 (2003); *Vickers, Inc.*, 152 NLRB 793 (1965). Election-party misconduct, objectively, "has the tendency to interfere with the employees' freedom of choice." *Cambridge Tool & Mfg. Co.*, 316 NLRB 716 (1995). When determining whether the alleged conduct meets the objective standard, the Board will consider a multitude of factors such as: (1) the number of incidents; (2) the severity of the incidents and whether they were likely to cause fear among the employees in the bargaining unit; (3) the number of employees in the bargaining unit subjected to the misconduct; (4) the proximity of the misconduct to the election; (5) the degree to which the misconduct persists in the minds of the bargaining unit employees; (6) the extent of dissemination of the misconduct among the bargaining unit employees; (7) the

effect, if any, of misconduct by the opposing party to cancel out the effects of the original misconduct; (8) the closeness of the final vote; and (9) the degree to which the misconduct can be attributed to the party. *Taylor Wharton Division*, 336 NLRB 157 (2001); see also, *GADecatur SNF LLC v. NLRB*, Nos. 20-1435, 20-1438, 2021 U.S. App. LEXIS 35393, at *6 (D.C. Cir., 2021) (Unpublished).

Here, the Union's agents repeatedly engaged in conduct towards voters that is unquestionably objectionable. For instance, the Union's agents frequently visited McLaughlin's home, despite his requests that they leave his property because they were trespassing. These individuals ignored McLaughlin's demands, and continued to come to his home, even while he was away and only his wife was home and refused to leave. On this occasion, the Union's Agents followed her around her yard demanding to speak with McLaughlin. McLaughlin's wife felt threatened and told the agents that she would call the police if they did not leave. These agents then texted McLaughlin obscene and inappropriate messages, calling him a "dick sucking faggot." Another employee, Ortiz, was repeatedly videoed by the Union's agents, who continued to show up at her home and film her, despite her incessant requests that they vacate her property. Carrillo also received texts messages from Union Agents offering to assist her with her ballot.

Consistent with its "obligation to protect Board-conducted elections," the Board has held that "a party's solicitation of one or more mail ballots"—even if

unsuccessful—"constitutes objectionable conduct that may warrant setting aside an election." *Professional Transportation Inc.,* 370 NLRB No. 132, (2021). In reaching that conclusion, the Board recognized that protecting elections from "actual interference" is "not enough" because "[e]ven the appearance of irregularity in election procedures may cast doubt on the validity of an election and its results." *Id.* at *3. The Board reasoned that attempted solicitation of mail ballots—even if done indirectly such as via text message—casts doubt on the integrity of the election, undermines the secrecy of employee ballots, and creates the false impression that the soliciting party is officially involved in running the election. *Id.* at *4 & n.21. In this particular situation, at least one employee would attest that the Union proposed to assist her in voting. While the influence of a single vote may be minimal, when combined with the other objections outlined in this context, it becomes evident that these threats and assistance cannot be analyzed in isolation. The collective impact of these actions, when considered alongside other factors affecting the election, prevents a fair and unbiased voting process. Therefore, these threats and assistance should be regarded as significant determinants if other objections are upheld.

In support of their claims, the employees were able to describe two Union Agents. The fact that employees could not identify the name of who issued the threats does not minimize the impact of their claims under Board law. In accordance with longstanding NLRB precedent, threats still must be analyzed under the party

26

conduct standard, and elections must be set aside if a party interferes with voters' free and uncoerced choice. *Baja's Place, Inc*., 268 NLRB 868, 868 (1984). This Court, too, has found that threatening statements that were addressed and disseminated to enough employees to potentially sway the outcome of an election, were sufficient to warrant setting aside an election result. *Manorcare of Kingston, PA, LLC v. NLRB*, 823 F.3d 81 (D.C. Cir. 2016).

This behavior most certainly meets the objective standard set forth in Taylor Wharton Division, because it occurred during the election period and reasonably interfered with employees' freedom of choice in the election. Acts as egregious as the aforementioned are naturally going to be well-known and impact a significant number of employees so as to ruin the laboratory conditions necessary to conduct a lawful and valid election. As such, the Regional Director's decision to overrule the Employer's objections on these matters was in error, and the election should be set aside.

It should also be noted that employees are often times hesitant to come forward with evidence of coercion, suppression or threats, let alone to provide affidavits to a company representative concerning issues related to coercion made by union supporters or union agents. While those employees may be suppressed in cooperating with an investigation done by company representatives. With the subpoena powers granted to the NLRB to provide such evidence in a hearing would

be mandatory. A company's request to provide such information is futile. The Employer provided evidence that individuals would and could testify to their experiences with Union Agents, but this evidence was ignored by the Regional Director and the Board. Certainly, if a notice of hearing was issued, such witnesses would have been subpoenaed and allowed to present their unfettered testimony with respect to such evidence.

### III.    The Region Demonstrated Bias In Its Handling Of The Employer's Post-Election Objections By Denying The Employer's Request For An Extension Of Time To Submit Evidence In Support Of Its Objections, Which Supports A Conclusion That The Board Erred In Denying The Employer's Objections.

Finally, the Region demonstrated bias when it denied the Employer's request for an extension of time to submit evidence in support of its objections, which were timely filed. It stands to reason that, by refusing to consider the Employer's proffered evidence, the Regional Director's decision was at best premature, and at worst, an indication that the Board cares more for a prompt certification than preservation of critical employee rights.

The Board allows losing parties to an election to file objections. Pursuant to the Board's Rules and Regulations., "Objections may be filed to conduct affecting the election or to the conduct of the election itself." Here, the Employer timely filed its objections within seven (7) days of the vote count but sought a brief extension of

time to file its evidence in support of its objections. Rules and Regulations of the National Labor Relations Board, Section 102.69(a).

Objections are supposed to be filed within seven days after the vote count date, but as long as the objections are postmarked no later than the day before the due date, they will be accepted, even if they arrive after the due date. *See* Rules and Regulations of the National Labor Relations Board, Section 102.111(b). Notably, neither the rule nor Board law contain any limitation on the number of days after the due date timely-mailed objections must arrive at the Board in order for them to be considered. For example, in *McLane Mid-Atlantic,* 316 NLRB 299 (1995), objections originally filed never arrived at the Regional office and a duplicate set had to be filed. Nevertheless, the duplicate objections were considered timely filed because the originals were mailed two days before the due date. *Id.*

The Regional Director's rejection of the Employer's October 14, 2022 supplemental submission of evidence in support of its objections and her reasoning for doing so is, at a minimum, a baseless departure from Board precedent. As an initial matter, by the standard in *McLane Mid-Atlantic*, the Regional Director's denial of a brief extension of time for the Employer to file its evidence in support of its objections, not the objections themselves, is counterintuitive and arbitrarily punitive.

29

As noted in the Regional Director's decision, "if the objecting party's offer of proof is insufficient, the Regional Director may reject it and overrule the objection without an evidentiary hearing." Curiously, the Regional Director noted that the supplemental offer of proof provided names of employees whose ballots were in question in one respect or another. The Employer's offer of proof also contained highly detailed information expounding on the Employer's objection regarding Union Agents' inappropriate, coercive and objectionable conduct. Per Board precedent, as discussed herein, the Employer's initial objections, even without the supplemental detail, regarding the Union's conduct should have triggered a hearing. The Regional Director's refusal to grant an evidentiary hearing, particularly regarding Union misconduct, constitutes a deprivation of employee rights and is indicative of an alarming bias against the Employer.

The margin of outcome in this case was 21 votes. The Objections filed in this matter concern 17 eligible voters who did not receive a ballot or did not timely receive a ballot, two who called the Region to request ballots but did not receive a call back, four who mailed in a ballot with sufficient time for it to arrive, but did not have them counted, five challenged ballots, at least six ballots that should not have been counted as a matter of law and three people who were threatened and intimidated by the Union regarding their vote. This is 31 individuals impacted, along with five challenged ballots. For this reason, too, this matter should have been set

for a hearing, as the Objections are necessarily determinative as to the outcome of the election. As detailed above, this Court and the Board both have recognized this to be sufficient grounds for overturning an election. See *Manorcare of Kingston, PA, LLC v. NLRB*, 823 F.3d 81 (D.C. Cir. 2016); *Cedars-Sinai*, 342 NLRB 596, 598 (2004); *Orr-Sysco Food Services, LLC,* 338 NLRB 614, 615 (2002) ("despite his statement to the contrary, the hearing officer did not sufficiently take into consideration the closeness of the election results.").

Had the Regional Director, and/or Board given proper and sufficient consideration to the number of employees impacted by the objectionable conduct and the closeness of the election results, the conclusion that the election must be set aside would have been inescapable. In the case at bar, where multiple instances of objectionable conduct are alleged, the Board cannot consider each instance in isolation and simply hold there is insufficient evidence that each such individual event interfered with laboratory conditions. But that is exactly what the Board did here. The Regional Director went to extreme efforts to compartmentalize the Employer's specific objections, and in so doing, erroneously failed to examine the cumulative effect of the Region's improper election administration, and the Union's misconduct. Consideration of evidence in the aggregate is required, and substantial evidence establishes that the totality of ballot mismanagement and objectionable conduct created an atmosphere of disenfranchisement, confusion, fear and reprisal

31

sufficient to overturn the election. See *Stannah Stairlifts, Inc.,* 325 NLRB 572 (1998).

## RELIEF SOUGHT

For each of the reasons set forth above, the Employer's Petition should be granted, and the Board's Order should be denied enforcement, and the matter remanded to the Board directing them to order a re-run election. Alternatively, short of directing a re-run election, the matter should be remanded to the Board for a hearing on the merits of the objections to the certification of election or a hearing on the merits of the 8(a)(5) case.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the Employer's Brief complies with Rule 28.1(e)(2)(A)(i) in that it contains less than 13,000 words.

Respectfully submitted,

VTCU Corp.

s:/ Andrew S. Goldberg
Andrew S. Goldberg
Counsel for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 8, 2024, the undersigned electronically filed the foregoing THE EMPLOYER'S BRIEF IN SUPPORT OF VTCU's PETITION FOR ADMINISTRATIVE REVIEW with the Clerk of the Court using the CM/ECF system. I further certify that on January 8, 2024, a true and correct copy of the foregoing THE EMPLOYER'S BRIEF IN SUPPORT OF VTCU's PETITION FOR ADMINISTRATIVE REVIEW was served on the following individuals by mail, U.S. postage prepaid, as follows:

Todd Saveland, Regional Attorney
National Labor Relations Board
Region 27
Byron Rogers Federal Office
Building
1961 Stout Street, Suite 13-103
Denver, Colorado 80294
Counsel for the General Counsel

Ruth E. Burdick, Esq.
Acting Deputy Associate General
Counsel
Appellate and Supreme Court Litigation
Branch
Office of General Counsel National
Labor Relations Board 1015 Half Street
SE Washington, D.C. 20570-0001

Matthew Lomax, Regional Director
Region 27
National Labor Relations Board
Byron Rogers Federal Office
Building
1961 Stout Street, Suite 13-103
Denver, CO 80294

Jeff Frazier, Esq.
International Union of Operating
Engineers, Local 302
18 East Street, SW
Auburn, Washington 98001-5268
jfrazier@ioue302.org

By: <u>s:/ Andrew S Goldberg</u>
    ATTORNEY FOR VTCU Corp.